# EXHIBIT 2



PARTNERS
MARK P. ROBINSON JR
KEVIN F. CALCAGNIE
JEOFFREY L. ROBINSON
WILLIAM D. SHAPIRO
ALLAN F. DAVIS
DANIEL S. ROBINSON*
   *Admitted In CA, NY, PA
KAREN BARTH MENZIES
SCOT D. WILSON

ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.

19 CORPORATE PLAZA DRIVE
NEWPORT BEACH, CALIFORNIA 92660
TELEPHONE: (949) 720-1288
FACSIMILE: (949) 720-1292
WWW.ORANGECOUNTYLAW.COM

LOS ANGELES OFFICE
600 S. COMMONWEALTH, SUITE 1254
LOS ANGELES, CA 90005
TELEPHONE: (213) 355-3525
FACSIMILE: (213) 355-3526

INLAND EMPIRE OFFICE
893 EAST BRIER DRIVE
SAN BERNARDINO, CA 92408
TELEPHONE: (909) 890-1000
FACSIMILE: (909) 890-1001

June 6, 2013

**VIA ELECTRONIC MAIL**

Andrew A. Chirls, Esq.
Fineman Krekstein & Harris
BNY Mellon Center
1735 Market Street, Suite 600
Philadelphia, PA 19103

      Re:     *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.,* MDL 2342

Dear Special Master Chirls:

      Per your request, this letter brief is submitted by the PSC to address the parties' competing proposals in the deposition protocol regarding the issue of *ex parte* communications with treating or prescribing healthcare physicians. In short, Pfizer seeks to restrict what Plaintiffs may discuss and show their treating and prescribing physicians during *ex parte* contacts while Plaintiffs oppose any such restrictions.

      **Introduction**

      The Defendant's request is not proper and is a disingenuous attempt to restrict communications between Plaintiffs' healthcare providers and their legal representatives for the purpose of tilting the playing field in its favor on an issue in which *Plaintiffs* already have the burden of proof. The PSC further believes that *ex parte* communications with Plaintiffs' physicians should be appropriately governed by state law and this Court should not undertake a radical revision of state law governing attorney ethics and physician-patient privileges.

      Moreover, unfounded claims of "woodshedding" do little to advance Pfizer's cause. Every state has its own ethics code or rules governing the conduct of lawyers, and every state has its own disciplinary procedure for violations of its code or rules. Pfizer's attempt to upend these individual standards in favor of a one-size-fits-all approach as it relates to *ex parte* contacts with Plaintiffs' physicians is unwise. More importantly, Pfizer has offered no evidence that any Plaintiffs' counsel in this litigation has engaged or intends to engage in any conduct that would violate any ethics code or rules, much less engage in conduct specifically aimed at unfairly biasing the independent judgment or testimony of Plaintiffs' physicians. In the unlikely event that such concerns come to fruition they can and should be addressed on a case-by-case basis.

Andrew A. Chirls, Esq.
June 6, 2013
Page 2

Additionally, Pfizer will have every opportunity to question the Plaintiffs' physicians regarding any *ex parte* communications at the physicians' depositions.

According, there is no need for this MDL Court to take the extraordinary step of issuing an all-encompassing order restricting Plaintiffs' contacts with their own physicians and effectively overturn the ethics and physician-patient privilege laws of the 50 states. *See* <u>Exhibit A</u> (50 state survey of *ex parte* laws).

**<u>Argument</u>**

The issue for consideration is whether Plaintiffs and their legal representatives should be limited in what they can say and show Plaintiffs' treating or prescribing healthcare providers during *ex parte* contacts. More specifically, Pfizer seeks to include, and Plaintiffs seek to exclude, from the deposition protocol the following restrictions on such *ex parte* communications:

> *Ex parte communications with treating or prescribing healthcare providers.* Contact with a treating or prescribing healthcare provider for a Plaintiff shall be governed by the relevant law in the jurisdiction in which the healthcare provider resides. Notwithstanding the foregoing, the parties' communications with Plaintiffs' treating or prescribing healthcare providers shall be limited to the individual care of the individual Plaintiff, and the parties shall not show or provide any documents to Plaintiffs' treating or prescribing healthcare providers other than those healthcare providers' records of treatment for a Plaintiff. Additionally, to the extent records of treatment are sent, opposing counsel shall be copied on any correspondence enclosing the same. This paragraph is not meant to restrict or prohibit communications with healthcare providers for the Plaintiffs related solely to the scheduling of or payment for a deposition or in connection with the Plaintiff's medical care. Opposing counsel shall, however, be copied on any written correspondence regarding scheduling or payment.

Although Pfizer does not request that it be allowed to directly engage in *ex parte* communications with Plaintiffs' physicians, its attempt to restrict what may be said and shown to Plaintiffs' physicians during Plaintiffs' *ex parte* meetings is no less egregious. The policy behind the physician-patient privilege is to encourage patients to communicate openly with their physicians, regardless of when the care was provided. The reality is that Zoloft has been aggressively marketed to physicians and other healthcare professionals since the drug obtained FDA approval in 1991. Over this 20-plus year span, Pfizer has inundated physicians with information about the positive attributes of Zoloft through a sophisticated marketing campaign while hiding relevant information about the drug's risks (as alleged in the complaints). Pfizer's marketing scheme included offering medical education seminars, distributing promotional booklets like the "Disease Management Portfolio," promoting the drug through programs like "Prime-MD" and "Rhythms," detailing physicians through thousands of sales representatives, and providing physicians with brochures, pamphlets, and other "leave behinds"—all designed to "educate" the physician and increase sales of Zoloft. The marketing scheme worked. In 2011,

Andrew A. Chirls, Esq.
June 6, 2013
Page 3

Zoloft was the second most prescribed antidepressant in the United States, with over 37 million prescriptions. To date, Pfizer has pocketed billions of dollars through sales of Zoloft.

Now, after profiting from the drug for over 20 years and engaging in its own version of "woodshedding" by distributing false and misleading promotional material to physicians for over two decades, Pfizer seeks to infringe upon the physician-patient relationship by limiting what the Plaintiffs can discuss and show their physicians during *ex parte* communications. At the same time, Pfizer is unable to cite to any rule or controlling authority that would prohibit an attorney from providing a witness with documents when engaged in permissible *ex parte* communications.

Neither can Pfizer provide any policy justification for asking this MDL court to upend the laws of attorney ethics and infringe upon the physician-patient relationship in this manner. As noted, every state has its own ethics code or rules governing the conduct of lawyers. Those rules should not be shrugged aside in such an *ad hoc* fashion solely at the Defendant's request and for the (undisclosed) purpose of obtaining a tactical advantage on an issue on which Plaintiffs have the burden of proof. In addition, the general rule regarding privilege in federal diversity cases does not apply in a MDL or other consolidated case setting.  The general rule in diversity cases provides: "Rulings on claims of privilege in diversity cases are governed by Federal Rule of Evidence 501, which provides that privilege is determined by state law where state law supplies the rule of decision." *Manual for Complex Litigation* (4th ed.) §11.431 at n. 126. Thus, Defendant's attempt to gain an advantage on an issue in which the Plaintiffs retain the burden of proof should be rejected.

Indeed, other courts that have considered requests similar to those sought here have rejected them. Recently, the defendant in *In re Yasmin* sought to limit plaintiffs' *ex parte* communications with treating physicians by preventing them from providing treating physicians with documents not previously seen by the physicians and inquiring as to how such documents might have changed the physicians' prescribing decisions, if at all. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, MDL 2100, 2011 WL 9996459, at *1 (S.D. Ill. Mar. 4, 2011), attached as <u>Exhibit B</u>. As here, the defendant stated it was concerned that such conduct could lead to "woodshedding." *Id.* After considering the parties' arguments and the relevant case law, Judge Herndon denied the request. *Id.* He correctly noted that "the Court is not aware of and the Defendants have not cited, any rule or controlling authority that prohibits an attorney from providing a witness with documents when engaged in permissible *ex parte* communications." *Id.* Recognizing that plaintiffs have the burden of proof, Judge Herndon refused to place any restrictions on what documents may be shown to plaintiffs' prescribing physicians:

When engaged in *ex parte* communications with Plaintiffs' treating physicians, Plaintiffs are permitted to provide treating physicians with documents not previously seen by said physicians and may inquire into how said documents might have changed the physicians' prescribing or treatment decisions, if at all. Documents that may be provided include: (1) research documents, scientific studies, and related materials; (2) internal Defendant documents; (3) documents

Andrew A. Chirls, Esq.
June 6, 2013
Page 4

>    identified as confidential and subject to Case Management Order Number 7
>    (MDL 2100 Doc. 291); and (4) product warnings or labels.

*Id*.

At the same time, to alleviate the possibility of improper coaching or unfair prejudicing of the witness (i.e. "woodshedding"), Judge Herndon ordered that any documents provided to the physicians may not contain notes, highlighting, etc. that would bring the reader's attention to a particular portion of the document. *Id*. at *2. He also ordered that plaintiffs must provide the defendants with copies of all documents provided to the physicians during *ex parte* communications at least 72 hours in advance of the physician's deposition. *Id*. Judge Herndon's treatment of the issue reflects a more rational approach. Plaintiffs have a full and fair opportunity to meet their burden of proof by engaging in *ex parte* communications to determine how certain documents may have changed the physicians prescribing decisions, if at all. Conversely, the defendant is afforded a reasonable opportunity to obtain in advance the documents shown to the witness so counsel can examine the witness relative to such *ex parte* communications.

Unfortunately, however, such a rationale approach does not appear acceptable to Pfizer. Even if the Plaintiffs agreed (as in the Bard MDL, *infra*) to provide Pfizer with a list of documents they intended to show to the Plaintiffs' physicians 48 hours prior to the physicians' deposition—which itself is not required by any statute or rule—Pfizer wants more. Pfizer apparently still seeks the ability to challenge what documents may be shown to the physicians before any *ex parte* communication. Such an approach is unworkable. To allow Pfizer this opportunity would, in turn, require dozens of mini-hearings, effectively bringing discovery to a halt. Given the demanding schedules of physicians—whose depositions are difficult to schedule even under ideal circumstances—depositions would have to be cancelled, delayed and reset while the Court considers its ruling. Once again, this Court should not engage in such an *ad hoc* procedure that necessarily would be created to accommodate Pfizer's proposal. Moreover, as a practical matter, it would be impossible to issue a one-size-fits-all order governing which documents could or could not be shown to physicians because any such list would necessarily change as additional discovery is made available. For these reasons, there should be no restrictions placed on what documents may be shown to Plaintiffs' treating or prescribing healthcare physicians during *ex parte* meetings so long as Plaintiffs comply with the requirements of Pretrial Order No. 8 (Protective Order) when showing the physicians confidential information. *See In re Yasmin*, 2011 WL 999645, at *2.

Similar to the issue raised in *Yaz*, the MDL court in the vaginal mesh litigation recently considered Bard's request to enter an order limiting *ex parte* communications between the plaintiffs' counsel and the plaintiffs' treating physicians to the plaintiffs' care and treatment at issue. *See In re C.R. Bard, Inc. Pelvic Repair System Prod. Liab. Litig.*, MDL No. 2187, Pretrial Order #48, at p.1, attached as Exhibit C.

In support of its argument to restrict such *ex parte* communications, Bard argued that allowing plaintiffs' counsel to discuss general causation issues and alleged corporate misconduct with plaintiffs treating physicians "improperly allows the plaintiffs to lobby their theories of liability and causation." *Id*. at p. 2. In response, the plaintiffs pointed out that (1) no statute or

Andrew A. Chirls, Esq.
June 6, 2013
Page 5

rule authorizes the proposed restrictions on *ex parte* communications with treating physicians, (2) for years Bard's sales representatives had significant and repeated *ex parte* contact with the physicians and surgeons in connection with the sale and implanting of Bard's products, and (3) under the learned intermediary doctrine, what the physician was told or not told by the sales representatives is significant, so *ex parte* discussions with plaintiffs' treating physicians about internal corporate documents and statements by sales representatives is fertile ground for *ex parte* discussions. *Id*. Notwithstanding its objections, plaintiffs were willing to compromise and give Bard 48 hours' notice of their intention to use the defendants' documents at depositions of treating physicians. *Id*. at p. 3.

The court denied Bard's motion, holding:

After due consideration of the parties' arguments and the cases cited by them, the court declines to impose limits on plaintiffs' counsel's *ex parte* communications with plaintiffs' treating physicians. *Neither a statute nor a rule suggests that such limits are appropriate; in fact it is accepted that attorneys are expected to prepare their witnesses for the rigors of giving testimony.* As this MDL develops, it becomes more apparent that the plaintiffs are pursuing multiple theories, including those of negligent design and negligent failure to warn. It is important to develop the facts as to what the defendants knew about their products' effects on women's pelvic organs and when they knew those facts. *Contents of corporate documents and statements of sales representatives to treating physicians and surgeons are appropriate areas of inquiry as to whether full disclosure would have changed a doctor's mind about implanting a pelvic mesh product.* The court accepts the plaintiffs' offer to disclose to defense counsel those documents produced by the defendants which plaintiffs' counsel intends to use in questioning plaintiffs' treating physicians or surgeons, and to make the disclosures at least 48 hours in advance of each deposition of a treating physician or surgeon.

*Id*. at p. 3-4 (emphasis added).

Notwithstanding the above-referenced authority rejecting defense proposals to limit plaintiffs' *ex parte* communications with plaintiffs' physicians, Pfizer has provided the Special Master with a contrasting order issued by Judge Inge Prytz Johnson in the *In re Chantix* litigation. *See generally In re Chantix (Varenicline) Prod. Liab. Litig*., MDL No. 2092 (order dated June 6, 2011), attached as <u>Exhibit D</u>. The Chantix order is hardly persuasive authority. As the Special Master correctly observed in his guidance document submitted to the parties, Chantix "reflects a great deal of ambivalence about every point touched upon." Plaintiffs agree. With due respect to Judge Johnson, Chantix was wrongly decided.

After discussing the "wisdom" of Judge Fallon's "words in a factually similar situation" in *In re Vioxx*, Judge Johnson inexplicably limited plaintiffs' counsels' communications with physicians to the individual care of the individual plaintiffs. *Id*. at p. 7. Judge Johnson went on, without citing to any authority whatsoever, to inexplicably prohibit plaintiffs' counsel from "discussing defendant's internal documents with plaintiffs' health care providers outside of a

Andrew A. Chirls, Esq.
June 6, 2013
Page 6

deposition or other on the record setting." *Id*. These restrictions came out of thin air; they were certainly not contained in the ordered issued by Judge Fallon in *Vioxx* upon which Judge Johnson purportedly relied.

Instead, the issue in *Vioxx* concerned whether the *defendants* would be allowed to engage in *ex parte* communications with plaintiffs' prescribing physicians. Initially, Judge Fallon entered an order on June 6, 2005 allowing *both* parties the opportunity to interview the plaintiffs' prescribing physicians so long as the opposing party was provided with notice of any such interview. Opposing counsel was then permitted to attend and participate in the noticed interview. *See generally In re Vioxx Prod. Liab. Litig*., 230 F.R.D. 470 (E.D. La. 2005), attached as Exhibit E.

Thereafter, the plaintiffs moved the court for modification of its June 6th order. The plaintiffs argued, among other things, that (1) the court's order is unprecedented, (2) the court's decision has discouraged participation in the MDL, and (3) the defendants' concern about potential woodshedding of witnesses is unwarranted because there was no evidence of such impropriety on the part of plaintiffs' counsel. *See In re Vioxx Prod. Liab. Litig*., 230 F.R.D. 473, 474 (E.D. La. 2005), attached as Exhibit F.

Judge Fallon agreed to revisit his prior ruling and "test[] its theoretical basis, its basis in logic, and its practical effect." *Id*. At the outset, the court noted that the purpose of the June 6th order was to put the parties on "equal footing with respect to interviewing the prescribing physicians." *Id*. at 475. While a laudable goal, Judge Fallon recognized that "the practical effect has created unintended consequences that can cause more problems than it sought to solve." *Id*. One of these unintended consequences is the chilling effect the previous order had on the MDL process. As explained by Judge Fallon:

> [T]he Court's initial approach has had a chilling effect on the MDL process, which was designed to coordinate litigation in one forum. While an adverse effect on the MDL process should not be determinative in the Court's decision on how to handle communications with physicians, it is not an irrelevant issue for MDL transferee judges. The Court's original approach has also interfered with the objective of the MDL process by placing Plaintiffs' counsel in a potential malpractice conundrum. Plaintiffs' counsel has to choose between filing their clients' cases in this MDL where they could not engage in private discussions with the plaintiff's treating physician, filing their cases in state courts that would allow them to have ex parte communications with the physicians, or first filing in state court in order to interview doctors and then removing to federal court and becoming part of the MDL. The effects of these decisions would leave the MDL with cases where some physicians previously have undergone interviews with Plaintiffs' counsel while others have not and now cannot. Clearly these unintended consequences can have a destructive effect on the efficient handling of this litigation and become problematic to both sides as well as to the Court. Another approach is called for.

Andrew A. Chirls, Esq.
June 6, 2013
Page 7

*Id.* The court also recognized the practical difficulty presented by the separate laws of fifty states, some of which provide for a broader physician-patient privilege than others. *Id.* at 477.

Thus, upon considered reflection, Judge Fallon agreed with the plaintiffs and modified his prior order. In his revised order, Judge Fallon concluded that "the just option ... is to *protect* the relationship between a doctor and patient by restricting defendants from conducting *ex parte* communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in *ex parte* interviews with those doctors who have not been named as defendants." *Id.* (emphasis added). At the same time, the court appropriately recognized that "if future progress of this litigation indicates any trend toward the improper use of ex parte communications with physicians, the Court will revisit the issue." *Id.* at 478.

Judge Fallon's revised opinion reflects a better-reasoned approach which gives due deference to the sanctity of the physician-patient relationship while reserving the court's ability to address any future trend towards abuse. The evolution of Judge Fallon's view on this subject represents the type of careful and considered judgment that is expected of our judiciary, particularly MDL judges. In fact, other MDL courts have since been guided by Judge Fallon's treatment of the issue in *Vioxx* and adopted his logic, pointing out that there is nothing unfair about allowing plaintiffs' counsel to conduct *ex parte* interviews with plaintiffs' physicians. *See In re Kugel Mesh Hernia Repair Patch Litig.*, 2008 WL 2420997, at *1 (D.R.I. Jan. 22, 2008) *objections overruled,* 2008 WL 2433253 (D.R.I. Feb. 25, 2008) and *order clarified,* 2008 WL 2810207 (D.R.I. July 21, 2008).

Notably, nothing in Judge Fallon's original or revised orders regarding *ex parte* communications with physicians imposes any restrictions on what may be said or shown by plaintiffs' to their physicians during *ex parte* communications. In this way, the restrictions imposed by Judge Johnson in the Chantix litigation are unprecedented. The Chantix order neither reflects the considered reasoning or approach of Judge Fallon in *Vioxx* nor any other federal judge, MDL or otherwise. Indeed, after researching the issue, it does not appear that Judge Johnson's order in Chantix has been followed by any other state or federal court in any published opinions since it was issued almost two years ago.

When Judge Johnson's Chantix order and the unconventional restrictions placed on *ex parte* communications identified therein was first presented to the Special Master, he observed that "it reflects a great deal of ambivalence about every point touched upon. . . . The MDL court should not take the step of overturning laws of attorney ethics and physician-patient privileges." The Special Master's initial impression was correct. *Ex parte* communications with plaintiffs' healthcare providers are rightly the purview of state law regulations governing ethics and physician-patient privilege. This Court should not tread down this treacherous road absent evidence of unethical conduct justifying the trip, and Pfizer has failed to provide any such evidence.

Andrew A. Chirls, Esq.
June 6, 2013
Page 8


   Accordingly, the PSC requests that the Special Master recommend striking Pfizer's proposed language regarding *ex parte* communications from the deposition protocol.

        Respectfully,

        /s/ Mark P. Robinson, Jr.

        Mark P. Robinson, Jr.
        Dianne M. Nast

Attachments

cc:  Mark S. Cheffo, Esq., (Defendants' Lead Counsel)

# "Exhibit A"

**APPENDIX OF STATE LAWS RELATING TO EX PARTE INTERVIEWS**[1]

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| Alabama | Unsettled | Disclosure of confidential information is actionable but filing suit waives privilege, allowing defense to obtain information, at least through formal discovery. | *Mull v. String*, 448 So. 2d 952 (Ala. 1984); *Horne v. Patton*, 287 So. 2d 824 (Ala. 1973). |
| Alaska | Yes | Physician has express right to refuse to engage in interview. | *Langdon v. Champion*, 745 P.2d 1371 (Alaska 1987). |
| Arizona | No | n/a | *Duquette v. Superior Court*, 778 P.2d 634 (Ariz. 1989). |
| Arkansas | No | n/a | *Kraemer v. Patterson*, 29 S.W.3d 684 (Ark. 2000). |
| California | Unsettled | Nonparty physician at risk for malpractice exposure is permitted to make disclosures to an associate/defendant's malpractice carrier. | *Heller v. Norcal Mut. Ins. Co.*, 32 Cal. Rptr. 2d 200 (Cal. 1994) (deeming inapposite earlier decisions prohibiting all ex parte disclosures but disapproving of decisions only "to the extent" they conflicted with the court's holding). |
| Colorado | Conditionally | Interviews "confined to matters that are not subject to physician-patient privilege and . . . plaintiff must be given reasonable notice of any proposed informal interview." | *Samms v. Dist. Court*, 908 P.2d 520 (Colo. 1995) (remanding so trial court could define the scope of the waiver of privilege). |

---

[1] All cited federal authorities discuss and apply state law.   Not routinely addressed by this chart are numerous individual state law issues such as whether notice would be required to the patient and/or physician; whether the patient or patient's attorney may attend the interview; whether the physician has the right to refuse to speak and whether the patient or defense counsel may or must notify the physician in this regard; whether the physician may or must have counsel and whether the physician may be liable under state law for the disclosure of improper information; what medical evidence might be deemed "relevant" to the case and thus subject to discussion; and what remedy is available to prohibit what a patient believes is an impermissible interview or one exceeding the permissible scope of such interviews. Nor does this chart attempt to predict which of these many issues would be a matter of substantive law under the *Erie* doctrine.

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|-------|------------------------------|--------------------------|-----------|
| Connecticut | No | n/a | *Valentino v. Gaylord Hosp.*, 1992 WL 43134 (Conn. Super. Ct. 1992). |
| Delaware | Conditionally | Interviews limited to relevant matters and physician has an express right to decline to discuss patient's condition and patient's attorney is given notice and an opportunity to attend. | *Green v. Bloodsworth*, 501 A.2d 1257 (Del. Super. Ct. 1985); *Hermann v. Lane*, 1988 WL 47085 (Del. Super. Ct. 1988). |
| D.C. | Conditionally | Interviews permitted only with respect to "relevant medical evidence," defined as "medical information relevant to the [personal injury] claim." | *Street v. Hedgepath*, 607 A.2d 1238 (D.C. 1992); *Doe v. Eli Lilly & Co.*, 99 F.R.D. 126 (D.D.C. 1983). |
| Florida | No | n/a | *Acosta v. Richter*, 671 So. 2d 149 (Fla. 1996). |
| Georgia | Unsettled | n/a | No reported decision could be located. *But compare Veasley v. State*, 570 S.E.2d 298 (Ga. 2002) (Georgia has no statutory or common-law privilege) *with Stephen E. Brown Radiology Assocs. v. Gowers*, 278 S.E.2d 653 (Ga. App. Ct. 1981) (doctor-patient relationship is "a confidential relationship"). |
| Hawaii | Unsettled | n/a | No reported civil decision could be located. *But see* Haw. R. Evid. 504(d)(3) (limited waiver of privilege by filing personal injury action) |
| Idaho | Unsettled | No controlling authority, though concurrence and dissent in *Pearce* case are lengthy and instructive as to why ex parte interviews should be forbidden | *Pearce v. Ollie*, 826 P.2d 888 (Idaho 1992) (Bistline, J., concurring in part and dissenting from dismissal of appeal). |
| Illinois | Conditionally | Interviews permitted only in medical malpractice suits with physician and vicariously liable parties, e.g., hospital. | *Morgan v. County of Cook*, 252 Ill. App. 3d 947 (Ill. App. Ct. 1993). |

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| Indiana | No | n/a | *Cua v. Morrison*, 626 N.E.2d 581 (Ind. App. Ct. 1993), *aff'd*, 636 N.E.2d 1248 (Ind. 1994). |
| Iowa | No | n/a | *Roosevelt Hotel Ltd. Partnership v. Sweeney*, 394 N.W.2d 353 (Iowa 1986). |
| Kansas | Conditionally | Interviews permitted where physician consents after receiving written notification of right to refuse interview. | *Watson v. Olathe Med. Ctr., Inc.*, 2002 WL 73395 (D. Kan. 2002) (surveying law). |
| Kentucky | Unsettled | n/a | No reported decision could be located.  *But see Atwood v. Atwood*, 550 S.W.2d 465 (Ky. 1976) (suggesting no physician-patient privilege exists in Kentucky). |
| Louisiana | No | Filing suit waives the privilege, but it is waived "only as to testimony at trial or to [formal] discovery of the privileged communication . . . ." | *Coutee v. Global Marine Drilling Co.*, 895 So.2d 631, 641 (La. App. Ct. 2005). |
| Maine | No | "[I]n order to preserve the integrity of the privilege, a defendant must be limited to the formal mechanisms of discovery . . . ." | *Neubeck v. Lundquist*, 186 F.R.D. 249 (D. Maine 1999). |
| Maryland | Yes | n/a | *Butler-Tulio v. Scroggins*, 774 A.2d 1209 (Md. App. Ct. 2001) (dicta). |
| Massachusetts | No | n/a | *Schwartz v. Goldstein*, 508 N.E.2d 97 (Mass. 1987). |
| Michigan | Conditionally | Interviews permitted to the extent privilege may be deemed to have been waived, subject to patient's right to seek protective order on that question. | *Domako v. Rowe*, 475 N.W.2d 30 (Mich. 1991). |
| Minnesota | No | n/a | *In re Baycol Prods. Litig.*, 219 F.R.D. 468 (D. Minn. 2003). |

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| Mississippi | Conditionally | Privilege is waived by filing suit but only relevant matters may be inquired into, subject to patient's right to a "judicial relevancy hearing." | *Scott v. Flynt*, 704 So. 2d 998 (Miss. 1996). |
| Missouri | Yes | Interviews are permitted but physicians are liable for damages arising from disclosure of confidential information. Of course, physicians may/must refuse to comply with requests for interviews. | *Brandt v. Pelican*, 856 S.W.2d 658 (Mo. 1993) (*Brandt I*); *Brandt v. Med. Defense Assocs.*, 856 S.W.2d 667 (Mo. 1993) (*Brandt II*). |
| Montana | Conditionally | Privilege is waived by filing suit but, as a procedural matter, a court cannot require an interview. Disclosure permitted only with respect to relevant matters. | *Ostermiller v. Alvord*, 720 P.2d 1198 (Mont. 1986); *Henricksen v. State*, 84 P.3d 38 (Mont. 2004). |
| Nebraska | Unsettled | "We have not yet decided whether one party can . . . meet ex parte with an opposing party's treating physician. Nor need we do so [because the issue was not preserved] . . . ." | *Olson v. Sherred*, 663 N.W.2d 617 (Neb. 2003). |
| Nevada | Unsettled | n/a | No reported decision could be located.  *But see* Nev. Rev. Stat. § 49.245(3) (filing suit waives privilege only "as to "*written* medical or hospital records . . . .") (emphasis added). |
| New Hampshire | No | n/a | *Nelson v. Lewis*, 534 A.2d 720 (N.H. 1987). |
| New Jersey | Conditionally | Interviews permitted with notice to patient's counsel, advance notice to physician regarding scope of interview, subject to patient's right to seek protective order.   Procedure deemed unworkable in New Jersey Vioxx litigation. | *Stempler v. Speidell*, 495 A.2d 857 (N.J. 1985). |
| New Mexico | No | n/a | *Smith v. Ashby*, 743 P.2d 114 (N.M. 1987); *Gomez v. Nielson's Corp.*, 894 P.2d 1026 (N.M. App. Ct. 1995). |

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| New York | Conditionally | Interviews not permitted outside of formal discovery, but different rule may apply once case has progressed beyond pretrial discovery stage. | *Anker v. Brodnitz*, 413 N.Y.S.2d 582 (N.Y. App. Ct. 1979); *Nielsen v. John G. Apisson*, 524 N.Y.S.2d 161 (N.Y. App. Ct. 1988). |
| North Carolina | No | n/a | *Crist v. Moffatt*, 389 S.E.2d 41 (N.C. 1990). |
| North Dakota | Conditionally | Physicians may choose to communicate with defense attorneys regarding matters "relevant to the lawsuit." | *Bohrer v. Merrill-Dow Pharma.*, 122 F.R.D. 217 (D.N.D. 1987). |
| Ohio | Unsettled | Code permits only formal discovery and privilege is deemed waived only to the extent of relevant injuries. | *Wargo v. Buck*, 703 N.E.2d 811 (Ohio App. Ct. 1997).  *See also Hammonds. v. Aetna Cas. & Sur. Co.*, 243 F. Supp. 793 (N.D. Ohio 1965) (ex parte interview improper). |
| Oklahoma | Conditionally | In cases other than medical malpractice cases, interviews may be had only through formal discovery. | *Thomas v. Four Seasons Nursing Ctrs., Inc.*, 206 F.R.D. 294 (N.D. Okla 2002). |
| Oregon | Unsettled | n/a | No reported decision could be located. *But see* Ore. Rev. Stat. § 40.230(4)(b)(A) (complete waiver as to "the condition" upon which a claim is brought). |
| Pennsylvania | Unsettled | Conflicting decisions predicting whether state public policy prohibits interviews. Civil procedure rules expressly prohibit interviews. | *Compare Manion v. N.P.W. Med. Ctr.of N.E. Pa., Inc.*, 676 F.Supp. 585 (M.D. Pa. 1987) *with MacDonald v. United States*, 767 F. Supp. 1295 (M.D. Pa. 1991); Pa. R. Civ. P. 4003.6. |
| Rhode Island | No | n/a | *Pitre v. Curhan*, 2001 WL 770941 (R.I. Super. Ct. 2001) (upholding statute specifically forbidding ex parte interviews). |
| South Carolina | Yes | n/a | *Felder v. Wyman*, 139 F.R.D. 85 (D.S.C. 1991). |

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| South Dakota | No | n/a | *Schaffer v. Spicer*, 215 N.W.2d 134 (S.D. 1974); S.D. Codified Laws § 19-2-3 (deeming privilege waived only at trial or for purposes of formal discovery). |
| Tennessee | No | "A physician breaches [the] implied covenant of confidentiality by divulging medical information, without the patient's consent, through informal conversations with others." | *Givens v. Est. of McElwaney*, 75 S.W.2d 383 (Tenn. 2002). |
| Texas | Conditionally | Interview permitted only with plaintiff's express consent and only on issues "relevant to" the litigation. | *Horner v. Rowan Cos.*, 153 F.R.D. 597 (S.D. Tex. 1994). |
| Utah | Unsettled | n/a | No reported decision could be located. *But see* Utah R. Evid 506(d)(1) (complete waiver as to "the condition" upon which a claim is brought). |
| Vermont | Unsettled | n/a | No reported decision could be located. *But see* Vt. R. Evid. 503(d)(3) (complete waiver as to "the condition" upon which a claim is brought). |
| Virginia | No | n/a | *McCauley v. Purdue Pharma., L.P.*, 224 F. Supp. 2d 1066 (W.D. Va. 2002). |
| Washington | Unsettled | Forbidden by *Loudon* case but statutory revision deems privilege waived 90 days after filing suit, subject to limitations that might be imposed by court rule. | *Loudon v. Mhyre*, 756 P.2d 138 (Wash. 1988); Rev. Wash. Code § 5.60.060(4). |
| West Virginia | No | Though there is no physician-patient privilege, fiduciary duties prohibit interviews. | *Kitzmiller v. Henning*, 437 S.E.2d 452 (W. Va. 1993). |
| Wisconsin | Conditionally | Defense attorney may not elicit confidential information, but may discuss "scheduling and procedural matters." | *Steinberg v. Jensen*, 534 N.W.2d 361 (Wis. 1995). |

| State | Permit Ex Parte Interviews? | Special Considerations? | Authority |
|---|---|---|---|
| Wyoming | Unsettled | n/a | No reported decision could be located. *But see Wardell v. McMillan*, 844 P.2d 1052 (Wyo. 1992) (suggesting complete waiver as to all conditions put at issue by filing suit). |

# "Exhibit B"



Slip Copy, 2011 WL 9996459 (S.D.Ill.)
**(Cite as: 2011 WL 9996459 (S.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Illinois.
In re YASMIN AND YAZ (DROSPIRENONE)
MARKETING, SALES PRACTICES AND PROD-
UCTS LIABILITY LITIGATION.
This Document Relates to: All Cases.

MDL No. 2100.
No. 3:09–md–02100–DRH–PMF.
March 4, 2011.

Mark R. Niemeyer, Onder, Shelton et al., Webster Groves, MO, Michael S. Burg, Burg Simpson Eldridge et al., Englewood, CO, Michael A. London, Douglas & London. P.C., New York, NY, Roger C. Denton, Schlichter, Bogard et al., St. Louis, MO, for Plaintiff.

Adam L. Hoeflich, Bartlit, Beck et al., Chicago, IL, John E. Galvin, Terry Lueckenhoff, Fox Galvin LLC, St. Louis, MO, Joseph P. Thomas, Ulmer & Berne LLP, Cincinnati, OH, for Defendants.

**ORDER NUMBER 29 REGARDING *EX PARTE* COMMUNICATIONS WITH TREATING PHYSICIANS**

DAVID R. HERNDON, Chief Judge.

**\*1** On March 1, 2011, the Court heard oral argument regarding *ex parte* contact between counsel and treating physicians and defendants hiring expert witnesses who are also treating physicians. Counsel indicated that the parties are near agreement on a majority of the issues. The Court directed the parties to continue working together to draft an agreed order pertaining to the retention of experts and related issues. The parties also indicated that they could not reach agreement regarding what restrictions, if any, should be placed on the Plaintiffs' substantive *ex parte* communications with treating physicians. It is clear there are generally two types of treating physicians encountered in this litigation. Plaintiffs have seen physicians who prescribed an oral contraceptive and have also been treated by one or more physicians who treated them for the injuries or ailments which are alleged in their complaints. Most of subject matter which is discussed in this order concerns the prescribing physician, but that is not necessarily the case and the order is not so self-limiting.

The Defendants have asked the Court to limit Plaintiffs' *ex parte* contact with treating physicians by foreclosing Plaintiffs from providing treating physicians with documents not previously seen by said physicians and inquiring how said documents might have changed the physicians' prescribing decisions, if at all. The Defendants are concerned that such conduct could unfairly bias treating physicians and lead to "woodshedding." [FN1] Plaintiffs strenuously object to any such restrictions, contending that *if* the concerns raised by the Defendants come to fruition they should be addressed on a case by case basis. Plaintiffs also contend that the Defendants will have an opportunity to question the treating physicians regarding any *ex parte* communications at the treating physician's deposition.

> FN1. The term "woodshedding" refers to impermissibly coaching a witness or unfairly prejudicing a witness during *ex parte* communications. *See e.g., In re OrthoEvra,* 2010 WL 320064 (N.D.Ohio Jan.20, 2010) (Katz, D.).

The Court has considered the parties' arguments and reviewed the relevant case law. The Court notes that although some MDL courts have imposed similar

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 9996459 (S.D.Ill.)
**(Cite as: 2011 WL 9996459 (S.D.Ill.))**

restrictions, *see e.g.,* *In re OrthoEvra, 2010 WL 320064 (N.D.Ohio Jan.20, 2010)* **(Katz, D.),** the Court is not aware of and the Defendants have not cited, any rule or controlling authority that prohibits an attorney from providing a witness with documents when engaged in permissible *ex parte* communications. Accordingly, the Court **ORDERS** as follows:

When engaged in *ex parte* communications with Plaintiffs' treating physicians, Plaintiffs are permitted to provide treating physicians with documents not previously seen by said physicians and may inquire into how said documents might have changed the physicians' prescribing or treatment decisions, if at all. Documents that may be provided include: (1) research documents, scientific studies, and related materials; (2) internal Defendant documents; (3) documents identified as confidential and subject to Case Management Order Number 7 (MDL 2100 Doc. 291); and (4) product warnings or labels.

**\*2 The Court further Orders:**

(1) Documents provided to treating physicians during such *ex parte* communications may not contain notes, highlighting, underlining, Plaintiff supplied redactions or any other markings that modify the document or direct a reader's attention to a particular portion of the document.

(2) Plaintiffs must provide the Defendants precise designations, descriptions or copies of all documents provided to treating physicians during such *ex parte* communications at least 72 hours prior to the treating physician's deposition.

(3) Plaintiffs must comply with the requirements of Case Management Order Number 7 (MDL 2100 Doc. 291) when providing treating physicians with any documents deemed confidential pursuant to Case Management Order Number 7.

**So Ordered.**

S.D.Ill.,2011.
In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation
Slip Copy, 2011 WL 9996459 (S.D.Ill.)

END OF DOCUMENT

# "Exhibit C"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

IN RE: C.R. BARD, INC.
PELVIC REPAIR SYSTEM
PRODUCTS LIABILITY LITIGATION

Case No. 2:10-md-2187

THIS DOCUMENT RELATES TO ALL CASES

### PRETRIAL ORDER # 48
(Defendants' Motion to Limit *Ex Parte* Interviews of
Plaintiffs' Treating Physicians by Plaintiffs' Attorneys)

In this multi-district litigation ("MDL") concerning products used to repair pelvic organ prolapse and stress urinary incontinence, the parties have been encouraged to bring before the court, without the filing of formal motions, those discovery disputes which they are unable to resolve among themselves. Pending before the court are two letters setting forth a dispute as to whether the court should enter an order limiting *ex parte* communications between the plaintiffs' counsel and the plaintiffs' treating physicians to the plaintiffs' care and treatment at issue in this litigation. The Clerk docketed the letters, dated July 31 and August 2, 2012, in this MDL, as "Motion for Protective Order" by C.R. Bard, Inc. (ECF No. 287) and "Plaintiffs' Response," (ECF No. 288) without the exhibits. The undersigned conducted a hearing on the letter motion on August 2, 2012.

The context of the letter motion is this: one of the bellwether cases in this MDL is *Wanda Queen v. C.R. Bard*, No. 2:11-cv-00012. The surgeon who implanted pelvic mesh in Ms. Queen is Dr. Elizabeth Barbee, whose deposition was taken on July 26,

2012. Prior to her deposition, plaintiffs' counsel interviewed Dr. Barbee on two occasions for several hours, referring to the contents of several of Bard's internal documents and displaying to Dr. Barbee one such document, entitled "Persistent Delayed Healing."

Bard contends that the meetings between plaintiffs' counsel and Dr. Barbee, which involved some discussion of general causation issues and alleged corporate misconduct, "improperly allows [*sic*] the plaintiffs to lobby their theories of liability and causation." *In re C.R. Bard, Inc. Pelvic Repair System Prod. Liab. Litig*., No. 2:10-md-2187, ECF No. 287, at 2. In addition, because Bard claims that Dr. Barbee's testimony extended beyond her role as a fact witness, Bard requests entry of an order requiring the plaintiffs to identify their treating physicians as expert witnesses and to provide written reports pursuant to Fed. R. Civ. P. 26(a)(2) prior to their depositions. *Id.* In support of its position on limiting the *ex parte* communications, Bard relies on *In re Ortho Evra Prod. Liab. Litig*., MDL No. 1742, No. 1:06-40000, 2010 WL 320064 (N.D. Ohio Jan. 20, 2010), and *In re NuvaRing Prods. Liab. Litig*., 4:08MD1964RWS (E.D. Mo. Mar. 20, 2009). With respect to expert witness reports, Bard cites *Goodman v. Staples the Office Superstore, LLC,* 644 F.3d 817, 819-26 (9th Cir. 2011), *Meyers v. Amtrak*, 619 F.3d 729, 735 (7th Cir. 2010), *Brooks v. Union Pac. R.R.,* 620 F.3d 896, 900 (8th Cir. 2010), and *Mohney v. USA Hockey, Inc.,* 138 Fed. Appx. 804, 811 (6th Cir. 2005).

The plaintiffs respond that no statute or rule authorizes the proposed restrictions on *ex parte* communications with treating physicians. (ECF No. 288 at 1.) They note that Bard's sales representatives had significant and repeated *ex parte* contact with the physicians and surgeons in connection with the sale and implanting of Bard's products. The plaintiffs assert that Bard may place blame on implanting physicians and surgeons;

thus the plaintiffs have "an obligation to inquire about their doctors' knowledge, training, experience and technique relative to these products, as well as the scope and substance of Defendants' doctor training programs and materials." *Id.* at 3. They contend that under the learned intermediary doctrine, what the doctor was told or not told by Bard and its representatives are important facts. *Id.* The plaintiffs cite to a few orders entered in other MDL cases which denied similar motions. With respect to expert witness reports, the plaintiffs argue that Dr. Barbee's "expert opinions" were actually "factual testimony based on her personal observations or thoughts in light of her own experience with these products and these Defendants." *Id.* at 6. To the extent that Dr. Barbee's testimony may be construed as "opinion," the plaintiffs assert that her opinions "related to the care and treatment of her patient and the product implanted in her patient." *Id.*

At the hearing on August 2, 2012, the parties presented their arguments further. Bard asserted that its counsel was "ambushed" by the use of its corporate documents at Dr. Barbee's deposition. Plaintiffs' counsel offered to give Bard 48 hours' notice of their intention to use the defendants' documents at depositions of treating physicians.

*Ex parte* communications with plaintiffs' treating physicians

After due consideration of the parties' arguments and the cases cited by them, the court declines to impose limits on plaintiffs' counsel's *ex parte* communications with plaintiffs' treating physicians. Neither a statute nor a rule suggests that such limits are appropriate; in fact it is accepted that attorneys are expected to prepare their witnesses for the rigors of giving testimony. As this MDL develops, it becomes more apparent that the plaintiffs are pursuing multiple theories, including those of negligent design and negligent failure to warn. It is important to develop the facts as to what the defendants

knew about their products' effects on women's pelvic organs and when they knew those facts. Contents of corporate documents and statements of sales representatives to treating physicians and surgeons are appropriate areas of inquiry as to whether full disclosure would have changed a doctor's mind about implanting a pelvic mesh product.

The court accepts the plaintiffs' offer to disclose to defense counsel those documents produced by the defendants which plaintiffs' counsel intends to use in questioning plaintiffs' treating physicians or surgeons, and to make the disclosures at least 48 hours in advance of each deposition of a treating physician or surgeon.

<u>Treating physicians as expert witnesses</u>

At the hearing, the court inquired as to the financial arrangement with respect to Dr. Barbee and other treating physicians and surgeons. Plaintiffs' counsel advised that Dr. Barbee charged an hourly rate for her time and there was no other financial arrangement with her. In the court's experience, all physicians charge an hourly rate for their time, no matter who is meeting with or questioning them; the billing and payment, considered in isolation, do not equate to being "retained or specially employed to provide expert testimony," as provided in Fed. R. Civ. P. 26(a)(2)(B). While treating physicians and surgeons are typically highly trained and educated, and offer opinions concerning their care and treatment of their patients, they do not automatically qualify as "expert witnesses" who must write a report and make Rule 26(a)(2)(B) disclosures. The Advisory Committee Notes to the 1993 Amendments to Rule 26 state that "[a] treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."

Ruling

It is hereby **ORDERED** that Bard's letter Motion for Protective Order (ECF No. 287) is **DENIED**, although attorneys for plaintiffs are directed to provide to defense counsel, at least 48 hours prior to the deposition of a treating physician or surgeon, copies of documents to be used at the deposition which were produced by the defendants. Absent evidence that a plaintiff's treating physician or surgeon is retained or specially employed to provide expert testimony, a Rule 26(a)(2)(B) written report will not be required. The parties shall bear their own costs.

The court **DIRECTS** the Clerk to file this Order; it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:12-cv-03583. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at www.wvsd.uscourts.gov.

ENTER: August 3, 2012

Mary E. Stanley
United States Magistrate Judge

# "Exhibit D"

FILED
2011 Jun-30  AM 11:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  CHANTIX (VARENICLINE) PRODUCTS LIABILITY LITIGATION | Master File No.: 2:09-CV-2039-IPJ MDL No. 2092 |

This Order Relates To:

    ALL CASES

## ORDER

A status conference was held in the above case on June 28, 2011, at which Lead Counsel for plaintiffs and Lead Counsel for defendant were present in person, and many individual plaintiffs' counsel were present in person or by telephone, and wherein, or as a result of, the following proceedings were held and actions taken:

With the agreement of the parties, it is Ordered by the court that the next status conference shall be held July 29, 2011, at 10:00 a.m., in Florence, Alabama.

At the status conference held June 28, 2011, the court received a report on the items listed on the parties' proposed agenda.  The parties informed the court that they were working together to resolve their differences regarding privilege log matters, and would continue to do so.

As to Agenda item number 3.b., concerning the status of discovery

pursuant to Pretrial Order No. 4, counsel informed the court that the parties are
attempting to resolve their differences concerning the defendant's production of
Adverse Event data and documents post-dating July 2009.  Should the parties
and their counsel be unable to resolve this issue, the same shall be set as an
Agenda item for the court's status conference in July 2011, and the parties are
given leave to file memoranda concerning their respective positions on this issue
on or before July 25, 2011.

Regarding the status of plaintiff fact sheet production, Agenda item
number 3.c., the defendant informed the court that approximately 60 plaintiffs'
fact sheets remain deficient in some significant manner.  Counsel for defendant
shall file appropriate motions as needed to resolve these deficiencies.

Item Four on the parties' Agenda concerns the issue of *ex parte* contact
with the plaintiffs' physicians, which the parties briefed prior to the status
conference.  *See* defendant's memorandum concerning *ex parte* contact with
physicians (doc. 294) and plaintiffs' memorandum of law in opposition to
defendant's request seeking permission to communicate, *ex parte*, with
plaintiffs' healthcare providers (doc. 293).  Although neither the plaintiffs nor
the defendant filed a motion to allow or disallow such communications, the
defendant did make an oral motion to be allowed to contact plaintiffs'
physicians, as set out in defendant's memorandum, and the court heard oral

argument in support of and in opposition to said oral motion. The parties agree that they seek a global approach to this issue, rather than the court applying the law of the underlying jurisdictions on a case by case basis.

The defendant seeks to speak *ex parte* to the plaintiffs' individual physicians who actually prescribed Chantix for each of the bellwether plaintiffs, although the defendant stated in both its memorandum and in open court that it does not seek to speak to those physicians about their actual care of the individual plaintiffs. Rather, the defendant asserts it seeks to question these non-party physicians concerning the physicians general prescribing practices and factual information that is in the public domain, such as labeling and promotional materials. The plaintiffs object to any such *ex parte* communications, asserting they have not waived "the physician patient privilege." Plaintiffs' memorandum, at 5.

At the status conference, the plaintiffs argued that defendant already knows plaintiffs' doctors prescription practices, because the defendant's representatives meet with these doctors on a regular basis. Similarly, the plaintiffs argued that the defendant already knows what promotional materials the plaintiffs' physicians have received, because the defendant is the source of these materials. Furthermore, the plaintiffs assert that the doctors have already reported to the defendant concerning the plaintiffs' adverse events.

3

According to the defendant, the cases selected for bellwether trials fall roughly into equal halves regarding the permissibility of defendant having *ex parte* contact with the plaintiffs' physicians based on the underlying jurisdiction of each of those cases. In other words, under state law in about half the bellwether cases, the defendant has the right to have *ex parte* communications with a plaintiff's non-party physician. The defendant stressed that it does not seek to have such *ex parte* conversations with plaintiffs' treating physicians concerning the individual plaintiffs' medical care. By the same token, the court is aware that the defendant already has information and medical records for the individual plaintiffs as the plaintiffs have completed detailed individual fact sheets and provided defendant with access to their individual medical records.

The defendant argued that since it has the right to talk to the individual plaintiffs' treating physicians in roughly half the bellwether cases, and that since it is willing to "sacrifice" this right in exchange for being able to speak to all plaintiffs' physicians about their generalized knowledge and prescribing practices, that the plaintiffs' counsel should be prohibited from speaking *ex parte* with treating physicians concerning defendant's internal documents or other information that is not publicly available.

Having considered the respective arguments of the parties, as well as their written memoranda, the court notes that it has no authority to make a physician

4

talk to both plaintiffs' counsel and defense counsel in a fair and equal manner.

Clearly, in any jurisdiction, the plaintiffs' counsel may have unlimited

conversations with  plaintiffs' individual doctors about plaintiffs' treatment.  As

to access to plaintiff's treating physicians by defense counsel, in some

jurisdictions there is a statutory physician-patient privilege, in some jurisdictions

there is a common-law physician-patient privilege, and in some jurisdictions, no

such privilege exists.

The purpose of statutory or common law privileges protecting

communications between a doctor and his patient is to promote greater freedom

of communication between physicians and their patients by providing the

relationship with a "cloak of confidence" and to prevent disclosure of

information concerning the patient which might result in his or her humiliation,

embarrassment or disgrace.  However, as one court aptly noted;

> The privilege was never intended ... to be used as a trial tactic by
> which a party entitled to invoke it may control to his advantage the
> timing and circumstances of the release of information he must
> inevitably see revealed at some time.

*Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C.1983).  Yet the court is struck

by how the parties before it are attempting to posture themselves and to control

the information provided a future trial witness to their own advantage.

Plaintiffs' counsel also suggested to the court that waiting until deposition

to show plaintiffs' physicians documents of the defendant will require each of
these depositions to take two days rather than just several hours.  However, the
court notes that under the parties' various proposals, the doctors in question will
be contacted not once for a deposition, but up to three separate occasions.
Furthermore, what both the defendant and plaintiffs seek to obtain through *ex
parte* communications can easily be gotten through depositions of these doctors.

Regardless of whether an actual privilege exists, "patients enjoy a right to
privacy and confidentiality with regard to disclosures made within the doctor-
patient relationship."  *See e.g., Ex parte St. Vincent's Hospital*, 991 So.2d 200,
208 (Ala.2008); *In re Kugel Mesh Hernia Repair Patch Litigation*, 2008 WL
2420997 (D.R.I. 2008) (denying defendant *ex parte* communications "in order to
preserve Plaintiffs' time honored privilege in their communications with their
healthcare providers"); *In re Vioxx Products Liability Litigation,* 230 F.R.D. 473,
476 (E.D.La.2005)(holding that allowing defense counsel access to plaintiffs'
treating physicians "without the approval of the patient, other than in a
deposition or pursuant to a court order, would be in direct conflict with the time
honored doctor-patient confidential relationship which has been recognized and
protected in both Western and Eastern civilization for over 2000 years").

The court has considered the wisdom of United States District Judge
Eldon Fallon's words in a factually similar situation.  He stated

The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in ex parte interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.

*In re Vioxx Products Liability Litigation,* 230 F.R.D. 473, 477 (E.D.La.2005).

Having considered the foregoing, the court concludes that neither plaintiffs' counsel nor defense counsel shall be allowed unfettered access to the plaintiffs' treating physicians.  Although plaintiffs' counsel is clearly permitted by law to have *ex parte* communications with their clients' treating physicians, the court **ORDERS** such communications are limited to the individual **care** of the individual plaintiffs, such as the plaintiffs' **treatment**, **medical records** and **conversations with their health care providers**.  Plaintiffs' counsel shall **not discuss defendant's internal documents** with plaintiffs' health care providers outside of a deposition or other on the record setting.   Similarly, the court

**ORDERS** that defendant and defense counsel shall not meet *ex parte* with plaintiffs' treating physicians regarding any matters, generalized or specific to the plaintiffs' individual claims.

      **DONE** and **ORDERED** this 30th day of June, 2011.

                              INGE PRYTZ JOHNSON
                              U.S. DISTRICT JUDGE

# "Exhibit E"

**470**            **230 FEDERAL RULES DECISIONS**

to the '314 patent or as to both the '314 and '285 patents can be resolved in part by reference to the language of the Fourth Circuit in *Intown Properties Mgmt., Inc. v. Wheaton Van Lines, Inc.*:

> Although consolidation "is permitted as a matter of convenience and economy in administration, [it] . . . does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."

271 F.3d 164, 168 (4th Cir.2001) (quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933)). In granting the motion to consolidate these cases for all purposes, this court did not merge the pleadings as to the '285 patent with those regarding the '314 patent. Consequently, the defense of inequitable conduct currently applies only to the '314 patent. However, if SPI seeks leave to amend its answer to include the defense of inequitable conduct as to the '285 patent, the court will be inclined to grant it for the reasons given in *MercExchange, L.L.C. v. eBay, Inc.*, 271 F.Supp.2d 784 (E.D.Va.2002) (no undue delay, bad faith, or dilatory motive on the movant's part, and no undue prejudice to the opposing party).

While reserving judgment on whether the '314 patent is a divisional application of the '285 patent, the court finds that Stowe had sufficient notice of the relatedness of these two cases to foreclose any argument of undue prejudice. *See also Elan Corp., PLC v. Andrx Pharm., Inc.*, 272 F.Supp.2d 1325, 1332 (S.D.Fla.2002) (allowing amendment of pleadings in consolidated cases to add a counterclaim alleging unenforceability on the basis of inequitable conduct as to the first case filed when the defense had originally been asserted only in the second case).

**D. Conclusion**

Claims of inequitable conduct are governed by the heightened pleading provisions of Rule 9(b), and therefore must be pled with particularity. The degree of particularity required is that which will give the opposing party sufficient notice to prepare an appropriate response. In particular, the party asserting the claim of inequitable conduct must provide the time, place, and contents of the inequitable conduct, in addition to the identi-

ties of those involved in the conduct. Each of these factors must be pled with particularity.

SPI has not given Stowe sufficient detail regarding the contents of its defense. The language "actions taken by foreign patent offices, and/or industry publications or products, including at least those of Interlink," is too vague to provide meaningful guidance to Stowe in formulating its response. Although SPI did provide Stowe with a specific patent number in its allegation that Stowe failed to disclose material prior art to the Patent Office, SPI did not go far enough in describing the actions taken by foreign patent offices and industry publications or products.

For the foregoing reasons, the plaintiff's motion to dismiss the defendant's defense of inequitable conduct will be granted. However, the defendant is free to seek leave to amend its answers to conform to the requirements of Rule 9(b) with respect to its defense of inequitable conduct.

The Clerk is directed to send certified copies of this Memorandum Opinion and the accompanying Order to all counsel of record.



---

## In re: VIOXX PRODUCTS LIABILITY LITIGATION

### No. MDL 1657.

United States District Court, E.D. Louisiana.

June 6, 2005.

**Background:** In centralized pretrial proceedings in products liability actions against manufacturer of prescription drug, plaintiffs sought to preclude defense counsel's ex parte communications with plaintiffs' treating physicians unless approved by court on defendant's motion, or consented to by plaintiffs.

IN RE VIOXX PRODUCTS LIABILITY LITIGATION        **471**
Cite as 230 F.R.D. 470 (E.D.La. 2005)

**Holding:** The District Court, Fallon, J., held that disallowance of unilateral interviews of prescribing physicians by either party, not just by manufacturer, was appropriate.

Ordered accordingly.

Order modified, 2005 WL 1812834.

**Federal Civil Procedure ⬤⟠1261**

During centralized discovery proceedings in multidistrict (MDL) products liability actions against manufacturer of prescription drug, disallowance of unilateral interviews of prescribing physicians by either party, not just by manufacturer, was appropriate; defense counsel's access raised issues of privacy, Health Insurance Portability and Accessibility Act (HIPAA) and physician-patient privilege, but at same time many physicians in question were actual or potential defendants. Social Security Act, § 1173(d)(2)(A–B), as amended, 42 U.S.C.A. § 1320d–2(d)(2)(A–B).

———————

Russ M. Herman, Herman, Herman, Katz & Cotlar, LLP, New Orleans, LA, for Vioxx Products Liability Litigation.

Phillip A. Wittmann, Stone Pigman Walther Wittmann, LLC, New Orleans, LA, for Defendant.

## ORDER & REASONS

FALLON, District Judge.

Before the Court are Plaintiffs' and Defendants' memoranda regarding ex parte communications with Plaintiffs' healthcare providers. For the following reasons, the Court holds that if either side wishes to interview a Plaintiff's prescribing physician, that party must first serve opposing counsel with five days notice of such interview in order to give opposing counsel the opportunity to be present and participate in the interview.

## I. BACKGROUND

This matter arises from damages Plaintiffs claim to have suffered from the manufacture, sale, distribution and/or use of the medication known generically as Vioxx, produced by Defendant Merck & Co., Inc. ("Merck") to treat arthritis and acute pain. The Plaintiffs have filed individual and class action suits in federal courts throughout the nation, alleging certain actual and potential risks associated with Vioxx. The Plaintiffs contend that Vioxx caused death and other injuries to themselves or their family members who took Vioxx.

The Judicial Panel on Multidistrict Litigation determined that the Plaintiffs' claims involved common questions of fact and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Therefore, on February 16, 2005, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Vioxx claims into a single multidistrict proceeding ("MDL 1657"). MDL 1657 was assigned to Judge Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate discovery and other pretrial matters in the pending cases. Subsequent Vioxx cases filed in federal court have been transferred to this district court to become part of MDL 1657 as "tag along" cases.

## II. EX PARTE COMMUNICATIONS WITH PLAINTIFFS' HEALTHCARE PROVIDERS

At the April 28, 2005 monthly pretrial conference, Plaintiffs' Liaison Counsel informed the Court of the Plaintiffs' Steering Committee's request that no interviews, discussions or communications with a plaintiff's healthcare provider take place with Defendants directly or indirectly through their representatives, employees, agents, or counsel without motions being filed with the Court of by consent of the plaintiff. The Court allowed the parties to file briefs on the issue. In the Plaintiffs' briefs, the Plaintiffs argue that the physician-patient privilege is well-recognized and time-honored in our society. The Plaintiffs point to several issues regarding a patient's fundamental right of privacy and the need to facilitate an environment of trust and confidence between a patient and his or her healthcare provider as reasons to prohibit defense counsels' ex parte communications with a plaintiff's treating physician. Among those arguments, the Plaintiffs claim that ex parte interview would violate the Health In-

surance Portability and Accessibility Act of 1996, 42 U.S.C. § 1320d, et seq. ("HIPAA"), which is intended to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information." 42 U.S.C. § 1320d–2(d)(2)(A) & (B)(ii). Furthermore, The Plaintiffs' express a concern that defense counsel may influence the doctors' view of the litigation if Defendants are afforded unfettered ex parte communication with Plaintiffs' healthcare providers.

Merck's briefs argue that many states do not recognize the physician-patient privilege or find a waiver of that privilege if the patient files a personal injury suit. Merck further argues that ex parte interviews with physicians are not prohibited by HIPAA so long as those interviews are undertaken in compliance with its requirements. Merck points to the fact that the Plaintiffs' healthcare providers are named defendants or potential defendants in the MDL. Therefore, Merck explains that, like the Plaintiffs, the Defendants worry that if the opposing party is afforded unfettered ex parte access to the Plaintiffs' physicians, opposing counsel may improperly influence the doctors. Merck posits that the most equitable solution is for the Court to require the presence of all counsel for any party's communications with treating physicians and other healthcare providers. Plaintiffs, however, feel that there is no legal support for Merck's request that the Court abolish the longstanding right of plaintiff's counsel to conduct client-authorized ex parte communications with that client's treating physician.

### III.  LAW AND ANALYSIS

There are several reasons for courts to prohibit or place constraints on a defendant's ex parte interviews of a plaintiff's physician. Such ex parte communications raise issues concerning privacy, HIPAA, and physician-patient privilege. Several courts have expressed concern that ex parte interviews of plaintiffs' doctors by defendants' counsel could encourage improper collusion between plaintiffs' doctors and attorneys representing defendants or otherwise undermine the confidential nature of the physician-patient relationship. *See Manion v. N.P.W. Medical Center of N.E. Pa., Inc.,* 676 F.Supp. 585, 593

(M.D.Pa.1987); *see also Harlan v. Lewis,* 141 F.R.D. 107, 111 (E.D.Ark.1992); *see further Crist v. Moffatt,* 326 N.C. 326, 389 S.E.2d 41, 46 (1990). Furthermore, courts have interpreted HIPAA as prohibiting ex parte interviews of a plaintiff's treating physician by defense counsel in the absence of strict compliance with HIPAA. *Law v. Zuckerman,* 307 F.Supp.2d 705, 707 (D.Md.2004). All of these concerns have led judges, such as the presiding judge in the currently-pending New Jersey Vioxx litigation, to prohibit defendant's ex parte communications with the plaintiffs' treating physicians. (*In re Vioxx,* Memorandum of Decision on Plaintiffs' Motion to Prohibit Ex Parte Interviews, Nov. 17, 2004).

This Court recognizes the impropriety of allowing Merck unfettered access to the Plaintiffs' healthcare providers. However, in the instant litigation, the same concerns that warrant restricting the Merck's ex parte interviews with Plaintiff's doctors who have prescribed Vioxx also apply to plaintiff counsels' communications with those doctors. The Plaintiff's prescribing physicians in MDL 1657 are potential defendants in the MDL, if they are not named defendants already. Furthermore, the prescribing physicians are either potentially or currently subject to indemnity agreements with Merck. Therefore, the Plaintiffs' prescribing physicians are not merely bystanders to this litigation. Rather, physicians who have prescribed Vioxx to Plaintiffs in this MDL have actualized or potential interests in this lawsuit. Therefore, they are just as susceptible to being influenced and colluding with Plaintiffs' counsel as they are to engaging in improper agreements with Defendants' counsel. Therefore, this Court finds that permitting unconstrained interviews or prescribing doctors by Plaintiffs' counsel is equally problematic.

The Federal Rules of Civil Procedure give federal courts wide discretion in case management. Federal courts possess an " 'inherent power' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.,* 370

IN RE VIOXX PRODUCTS LIABILITY LITIGATION        **473**
Cite as 230 F.R.D. 473 (E.D.La. 2005)

U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Given the unique position of the prescribing physicians in this multidistrict litigation, this Court determines that this case would be most efficiently and fairly managed by disallowing unilateral interviews of prescribing physicians by any party. If either side wishes to interview a Plaintiff's prescribing physician, that party must first serve opposing counsel with five days notice of such interview in order to give opposing counsel the opportunity to be present and participate in the interview. This procedure for communications with prescribing physicians will provide a safeguard against improper influence by any party. The scope of such interviews will still be subject to limits set forth in HIPAA and any other applicable state or federal law. In essence, this ruling merely requires both Plaintiffs and Defendants to be given an opportunity to participate in any interview of healthcare providers who have prescribed Vioxx to a plaintiff in this litigation.

### III.  CONCLUSION

For the reasons set forth above, IT IS ORDERED that any party wishing to interview a Plaintiff's prescribing physician must serve Liaison Counsel for the opposing party with five days notice of such interview. Opposing counsel will then be permitted to attend and participate in the noticed interview. If opposing counsel decides not to participate in the interview, the noticing party may conduct said interview without opposing counsel's presence.



---

**In re: VIOXX PRODUCTS LIABILITY LITIGATION**

**This Document Relates to All Cases**

**No. MDL 1657.**

United States District Court,
E.D. Louisiana.

July 22, 2005.

**Background:** In centralized pretrial proceedings in products liability actions against manufacturer and wholesaler of

prescription drug, plaintiffs sought to modify earlier order by the District Court, 2005 WL 1383152, Fallon, J., requiring that either side wishing to interview a plaintiff's prescribing physician serve five days' notice to opposing counsel.

**Holding:** The District Court held that narrowing of order was warranted so that same restriction remained in place for defendants, but plaintiffs' counsel could engage in ex parte interviews with physicians who had not been named as defendants.

Motion granted.

---

**1. Federal Civil Procedure** ⚖928

Motion to reconsider should be granted only where movant demonstrates: (1) intervening change in controlling law; (2) availability of new evidence not previously available; or (3) need to correct clear error of law or to prevent injustice.

**2. Federal Civil Procedure** ⚖1271

In centralized pretrial proceedings in multidistrict (MDL) products liability actions against manufacturer and wholesaler of prescription drug, modification to prevent injustice was warranted as to district court's discovery order requiring that either side wishing to interview plaintiff's prescribing physician serve five days' notice to opposing counsel; breadth of order had chilling effect on MDL process and created inconsistencies with related state litigation, warranting narrowing of order so that same restriction remained in place for defendants, but plaintiffs' counsel could engage in ex parte interviews with physicians who had not been named as defendants.

---

Russ M. Herman, Leonard A. Davis, Herman, Herman, Katz & Cotlar, LLP, New Orleans, LA, for Plaintiff.

Phillip A. Wittmann, Stone Pigman Walther Wittmann, LLC, New Orleans, LA, for Defendant.

# "Exhibit F"

U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). Given the unique position of the prescribing physicians in this multidistrict litigation, this Court determines that this case would be most efficiently and fairly managed by disallowing unilateral interviews of prescribing physicians by any party. If either side wishes to interview a Plaintiff's prescribing physician, that party must first serve opposing counsel with five days notice of such interview in order to give opposing counsel the opportunity to be present and participate in the interview. This procedure for communications with prescribing physicians will provide a safeguard against improper influence by any party. The scope of such interviews will still be subject to limits set forth in HIPAA and any other applicable state or federal law. In essence, this ruling merely requires both Plaintiffs and Defendants to be given an opportunity to participate in any interview of healthcare providers who have prescribed Vioxx to a plaintiff in this litigation.

### III. CONCLUSION

For the reasons set forth above, IT IS ORDERED that any party wishing to interview a Plaintiff's prescribing physician must serve Liaison Counsel for the opposing party with five days notice of such interview. Opposing counsel will then be permitted to attend and participate in the noticed interview. If opposing counsel decides not to participate in the interview, the noticing party may conduct said interview without opposing counsel's presence.



**In re: VIOXX PRODUCTS LIABILITY LITIGATION**

**This Document Relates to All Cases**

**No. MDL 1657.**

United States District Court,
E.D. Louisiana.

July 22, 2005.

**Background:** In centralized pretrial proceedings in products liability actions against manufacturer and wholesaler of prescription drug, plaintiffs sought to modify earlier order by the District Court, 2005 WL 1383152, Fallon, J., requiring that either side wishing to interview a plaintiff's prescribing physician serve five days' notice to opposing counsel.

**Holding:** The District Court held that narrowing of order was warranted so that same restriction remained in place for defendants, but plaintiffs' counsel could engage in ex parte interviews with physicians who had not been named as defendants.

Motion granted.

1. **Federal Civil Procedure** ⚷928

Motion to reconsider should be granted only where movant demonstrates: (1) intervening change in controlling law; (2) availability of new evidence not previously available; or (3) need to correct clear error of law or to prevent injustice.

2. **Federal Civil Procedure** ⚷1271

In centralized pretrial proceedings in multidistrict (MDL) products liability actions against manufacturer and wholesaler of prescription drug, modification to prevent injustice was warranted as to district court's discovery order requiring that either side wishing to interview plaintiff's prescribing physician serve five days' notice to opposing counsel; breadth of order had chilling effect on MDL process and created inconsistencies with related state litigation, warranting narrowing of order so that same restriction remained in place for defendants, but plaintiffs' counsel could engage in ex parte interviews with physicians who had not been named as defendants.

————

Russ M. Herman, Leonard A. Davis, Herman, Herman, Katz & Cotlar, LLP, New Orleans, LA, for Plaintiff.

Phillip A. Wittmann, Stone Pigman Walther Wittmann, LLC, New Orleans, LA, for Defendant.

## ORDER AND REASONS

FALLON, District Judge.

On June 29, 2005, the Court heard oral argument on Plaintiffs' Motion to Modify the Court's June 6, 2005 Order and Reasons. For the following reasons, the Plaintiffs' motion is GRANTED and the Court's June 6, 2005 Order and Reasons is modified to apply to the Plaintiffs in circumstances where the prescribing physician has been named as a defendant.

### I.  *Plaintiffs' Motion to Modify*

In an Order issued June 6, 2005, this Court ruled that any attorney or representative of any party wishing to interview a Plaintiff's prescribing physicians must serve Liaison Counsel for the opposing party with five days notice of such interview.  According to the Order, opposing counsel would then be permitted to attend and participate in the noticed interview, but if opposing counsel decided not to participate in the interview, the noticing party could conduct said interview without opposing counsel's presence.  The Plaintiffs have moved the Court to modify this Order by limiting the applicability of the Order as it applies to Plaintiffs' counsel to circumstances in which the treating physician actually has been named as a defendant. Plaintiffs seek this modification for several reasons:

First they argue that the Court's order is unprecedented and inconsistent with practice in other major venues of the Vioxx litigation. The Plaintiffs point to other MDLs as well as Vioxx litigation in various states in which courts have allowed Plaintiffs' counsel to contact treating physicians without the presence of defense counsel.

Second, Plaintiffs suggest that the Court's decision has discouraged participation in the MDL.

Third, Plaintiffs argue that the Court's concern about Plaintiffs' contact with physicians who are potential defendants is not needed because there is no evidence of impropriety on the part of Plaintiffs' counsel with regard to communications with physicians.  The Plaintiffs further state that amendments to add physicians are unlikely because the Plaintiffs' main theory is that doctors were never allowed to become learned intermediaries since Merck failed to disclose known risks of heart attacks to the medical community.  Therefore, adding doctors as defendants in most circumstances would undermine this theory by suggesting that the doctors are at fault.  Accordingly, the Plaintiffs believe that the Court's June 6, 2005 Order should be modified to conform with the Court's policy reasons for denying the ex parte communications for any party, and only should apply to the Plaintiffs where the treating physician has an interest in the litigation because he or she has been named as a defendant.

Merck opposes such modification, claiming that the Plaintiffs have used the motion for reconsideration to rehash previous arguments.  Merck argues that the Court's concerns regarding Plaintiffs' communications with doctors is not unfounded.  To support this position, Merck points to a letter in which a plaintiffs' lawyer threatened to name doctors as defendants in Vioxx suits and to tell the doctors that it was Merck's fault because Merck refused to waive its right to remove Vioxx cases to federal court.  Further, Merck points to a plaintiffs' attorney working for a firm represented on the PSC who, at a Vioxx conference, encouraged other plaintiffs' lawyers to sway physicians to accept plaintiffs' theories in Vioxx cases. Merck questions why Plaintiffs cannot obtain factual information from doctors in the presence of a defense attorney.  According to Merck, the real concern regarding undue influence is with physicians who have not already been sued, because those who have been sued will be represented by counsel. Further, Merck argues that the Court should not skew the law in order to encourage more federal court filings, as Merck believes the Plaintiffs are advocating.

After considering the briefs and arguments of counsel the Court revisits its prior ruling and tests its theoretical basis, its basis in logic, and its practical effect.

### II.  *Analysis*

[1]  A motion to reconsider should be granted only where the movant demonstrates: (1) intervening change in controlling law, (2) the availability of new evidence not

## IN RE VIOXX PRODUCTS LIABILITY LITIGATION   475
Cite as 230 F.R.D. 473 (E.D.La. 2005)

previously available, or (3) the need to correct a clear error of law or to prevent injustice.[1] "Reconsideration of an order is an extraordinary remedy which courts should use sparingly."[2] Further, motions for reconsideration are not to be used "to re-debate the merits of a particular motion."[3]

In the instant case, the Plaintiffs have not satisfied requisites (1) or (2) of the standard for motions to reconsider. However, the Plaintiffs have claimed that the Court's order should be modified to prevent injustice. Therefore, the Plaintiffs have filed a valid motion for reconsideration. In fact, the Plaintiffs have characterized their motion as a motion to modify rather than a motion for reconsideration because the Plaintiffs have not taken issue with the Court's reasoning. Rather, the Plaintiffs argue that the Court's reasoning need not lead to such a broad prohibition against Plaintiffs' contacts with their own prescribing physicians.

[2] At the outset, the Court's notes that the purpose of the June 6, 2005 opinion and order was to put Plaintiffs and Defendants on an equal footing with respect to interviewing the prescribing physicians. While the logic and reasoning of the opinion are sound, the practical effect has created unintended consequences that can cause more problems than it sought to solve. This is of concern and causes the Court to reevaluate its prior approach.

It is important to recognize that the current issue is a discovery issue and not a substantive one. Discovery is intended to assist counsel for all parties to prepare for trial. It is not intended to make life more difficult or to distract them from the primary issues of the litigation. If or when it does, the discovery method needs to be reevaluated. This observation is not intended to trivialize discovery; it is an essential part of a case, but it has to be kept in perspective.

With this principle in mind, the Court turns to the issues raised by the Plaintiffs.

Plaintiffs point out that in determining whether to take or keep a case, it is often important for a plaintiff's counsel to interview the plaintiff's treating physician regarding the plaintiff's personal medical history. The approach taken in the Court's previous Order presents an obstacle to this important process. Furthermore, the Court's initial approach has had a chilling effect on the MDL process, which was designed to coordinate litigation in one forum. While an adverse effect on the MDL process should not be determinative in the Court's decision on how to handle communications with physicians, it is not an irrelevant issue for MDL transferee judges. The Court's original approach has also interfered with the objective of the MDL process by placing Plaintiffs' counsel in a potential malpractice conundrum. Plaintiffs' counsel has to choose between filing their clients' cases in this MDL where they could not engage in private discussions with the plaintiff's treating physician, filing their cases in state courts that would allow them to have ex parte communications with the physicians, or first filing in state court in order to interview doctors and then removing to federal court and becoming part of the MDL. The effects of these decisions would leave the MDL with cases where some physicians previously have undergone interviews with Plaintiffs' counsel while others have not and now cannot. Clearly these unintended consequences can have a destructive effect on the efficient handling of this litigation and become problematic to both sides as well as to the Court. Another approach is called for.

One option would be to allow both sides to have unfettered ex parte access to the Plaintiffs' treating physicians. The advantage of this approach is that it too treats each side the same. Furthermore, the Defendants make the argument that the treating physicians in this case are really fact witnesses and both sides should have equal access to fact witnesses for ex parte conferences. The treating physicians in this case are in a dif-

---

**1.** *Freeport–McMoran Sulphur LLC v. Mike Mullen Energy Equip. Resource, Inc.,* 2004 WL 1488665, *1, 2004 U.S. Dist. LEXIS 12183, *4 (E.D.La. June 30, 2004), citing *Motiva Enters. LLC v. Wegmann,* 2001 WL 246414, 2001 U.S. Dist. LEXIS 3049 (E.D.La. Mar. 12, 2001).

**2.** *Schildkrant v. Bally's Casino New Orleans, LLC,* 2004 U.S. Dist. LEXIS 21412, *1 (E.D.La. Oct. 20, 2004).

**3.** *Freeport–McMoran Sulphur LLC,* 2004 WL 1488665, *1, 2004 U.S. Dist. LEXIS 12183 at *4; *see also Schildkraut,* 2004 U.S. Dist. LEXIS 21412 at *2.

ferent role than the treating physician in a typical personal injury case. In a typical tort or product liability case the physician has had no contact or had nothing to do with the event that allegedly caused the claimed injury. In the present case, however, the treating physician does play a role in the event complained of by the Plaintiffs. Specifically, the physician is the one who prescribed the medication that allegedly caused the Plaintiffs' injuries and resultant damages.

At first blush, the treating physicians in this case seem more like "fact" witnesses than expert witnesses. On closer scrutiny, however, it is clear that the physicians are both fact and expert witnesses. However, with regard to the former, the "facts" that the treating physician has knowledge of were discovered during the time of a private, privileged relationship. To release this information without the approval of the patient, other than in a deposition or pursuant to a court order, would be in direct conflict with the time honored doctor-patient confidential relationship which has been recognized and protected in both Western and Eastern civilization for over 2000 years.

The special relationship which exists-and some would insist, must exist between a patient and his or her doctor was first recognized by Hippocrates of Cos in the fifth century B.C. and is codified in the Hippocratic oath. The classical version of the Hippocratic Oath reads in pertinent part: "What I may see or hear in the course of the treatment or even outside of the treatment in regard to the life of men, which on no ac-

count one must spread abroad, I will keep to myself, holding such things shameful to be spoken about."[4] The principles set forth in the ancient Hippocratic Oath were formally introduced to modern Western society in 1803 with Thomas Percival's publication of *Medical Ethics.*[5] The American Medical Association ("AMA") adopted Percival's precepts in 1847 in its first Code of Ethics.[6] The modern AMA rule, promulgated by the AMA's Council on Ethical and Judicial Affairs in 1998, states that "information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree."[7] Today, most graduates of medical schools in this country recite a modern version of the Hippocratic Oath upon matriculation.[8]

The importance of the physician-patient relationship is not limited to Western medicine. An Oath of Initiation, required of practitioners of Ayurvedic medicine in India since the fifth century B.C., stresses confidentiality of the physician-patient relationship as well.[9] In China, Sun Ssu–Miao, a pioneer of Chinese medicine, authored the "Thousand Golden Remedies" in the seventh century A.D.[10] The text outlines the decorum and discretion required of physicians, especially with regard to their dealings with patients. The physician-patient relationship is also described in the Oath of Asaph, required of practitioners of Hebrew medicine since approximately the sixth century A.D.[11] In particular, the Oath of Asaph requires physicians to "not divulge the secret of a man who has trusted you."[12]

---

**4.** Translation from the Greek by Ludwig Edelstein, *From The Hippocratic Oath: Text, Translation, and Interpretation* (Johns Hopkins Press, 1943).

**5.** John W. Clark, *Confidential Communications in a Professional Context: Attorney, Physician, and Social Worker,* 24 J. Legal Prof. 79, 91 (Spring 2000).

**6.** *Id.*

**7.** *Id.* at 92, citing Council on Ethical and Judicial Affairs, Am. Medical Ass'n, Code of Medical Ethics: Current Opinions with Annotations VII, Rule 5.05 (1998).

**8.** The modern version of the Hippocratic Oath, as modified in 1946 by Louis Lasagna, Academic Dean of the School of Medicine at Tufts University, reads in pertinent part: "I will respect the

privacy of my patients, for their problems are not disclosed to me that the world may know."

**9.** V. Balakrishna Panicker, et al., *Indian Contributions to Science,* Swadeshi Science Movement, pp. 8–9 (2002); *see also* Clark at 90–91 n. 76.

**10.** *See id.* at 91 n. 78; *see also* T'ao Lee, *Medical Ethics in Ancient China,* Bulletin of the History of Medicine 13, pp. 268–77 (1943).

**11.** *See* Clark at 91 n. 77.

**12.** Shlomo Pines, *The Oath of Asaph the Physician and Yohanan Ben Zabda: Its Relation to the Hippocratic Oath and the Doctrina Duarum Viarum of the Didache,* Proceedings of the Israel Academy of Sciences and Humanitis 9, pp. 223–264 (1975).

**IN RE VIOXX PRODUCTS LIABILITY LITIGATION**     **477**

Cite as 230 F.R.D. 473 (E.D.La. 2005)

The physician-patient privilege has transfigured from a code of ethics into a matter of law in most states in this Union. In 1776, the English case of Elizabeth, Duchess of Kingston, established that the physician-patient privilege did not exist as a matter of English common law.[13] However, in 1828, New York passed a statute codifying the physician-patient privilege.[14] Forty states and the District of Columbia have since similarly codified the physician-patient privilege.[15]

The ethical rules and attendant laws regarding the relationship between a physician and a patient serve both utilitarian and fairness purposes. Confidentiality reduces the stigma attached to seeking treatment for some infectious diseases and invites patients to provide information about previous ailments with greater candor.[16] This effect allows physicians to provide more thorough preventative care. Moreover, because "[a]lmost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, [ ] every patient has a right to rely upon this warranty of silence."[17] Impairing the relationship between a physician and a patient would therefore not only be unfair to patients that have provided information to their physicians in confidence, but could reduce the quality of medical care provided.

In this litigation, the information imparted to the physicians by the Plaintiffs was given to the doctors while they were in the course of their well-established confidential relationship with the Plaintiffs. Therefore, this confidential relationship and the effect that counsels' communications would have on that relationship are very relevant concerns for the Court in fashioning appropriate guidelines for communications with the Plaintiffs' prescribing physicians. The Court also has to consider the Health Insurance Portability and Accessibility Act of 1996, 42 U.S.C.

§ 1320d, et seq. ("HIPAA"), which is intended to "ensure the integrity and confidentiality of [patients'] information" and to protect against "unauthorized uses or disclosures of the information."[18] Further, this MDL case involves the separate laws of fifty states, some of which provide for a broader physician-patient privilege than others. The Court realizes that the physicians in this litigation are in a different position than in the typical personal injury case. This peculiarity, however, does not justify destroying the physician-patient relationship and all of the concerns that arise because of that relationship.

The Court, upon further reflection, now feels that the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting ex parte communications with Plaintiffs' treating physicians but allowing Plaintiffs' counsel to engage in ex parte interviews with those doctors who have not been named as defendants. This approach appears, at first glance, to be one sided and unfair. However, in actuality and as a practical matter, it is not. This modification does not leave the Defendants without any access to information. The Defendants still are entitled to all of the medical records of the Plaintiffs as well as the Plaintiff Profile Forms setting forth each Plaintiff's detailed medical history. The Defendants can also continue to exercise their right to depose the Plaintiffs' treating physicians or confer with them in the presence of Plaintiffs' counsel. Furthermore, as a practical matter, the Defendants already have information, including documentation, regarding what its representatives told the treating physicians about Vioxx. Therefore, the Defendants do not need the doctors to tell them in ex parte conferences what they already know.

---

**13.** *Rex. v. Duchess of Kingston,* 20 How. St. Tr. 355, 572–73 (1776).

**14.** Daniel W. Shuman, *The Origins of the Physician–Patient Privilege and Professional Secret,* 39 Sw. L.J. 661, 676 (June 1985) citing N.Y.Rev. Stat. 1829 II, 406, part III, tit. 3, ch. VII, art. VIII, § 79.

**15.** Shuman at 677.

**16.** *Developments in the Law—Privileged Communications,* 98 Harv. L.Rev. 1530, 1532–33 (May 1985).

**17.** *Hammonds v. Aetna Cas. & Sur. Co.,* 7 Ohio Misc. 25, 243 F.Supp. 793, 801 (N.D.Ohio 1965).

**18.** 42 U.S.C. § 1320d–2(d)(2)(A) & (B)(ii).

**478**      230 FEDERAL RULES DECISIONS

III.  *Conclusion*

For the aforementioned reasons, IT IS ORDERED that the Court's June 6, 2005 Order and Reasons be modified with respect to the Plaintiffs to apply only to circumstances where the prescribing physician has been named as a defendant.  As the Court mentioned at oral argument, this modification is not set in stone.  If future progress of this litigation indicates any trend toward the improper use of ex parte communications with physicians, the Court will revisit this issue.



John MARANTO

v.

DILLARD NATIONAL BANK

No. CIV.A. 05–0348.

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 27, 2005.

**Background:**  Plaintiff moved for award of fees and costs in connection with service of process.

**Holdings:**  The District Court, Hornsby, United States Magistrate Judge, held that:

(1) plaintiff was entitled to recover costs of hiring private process server, postage, copying, and attorney time spent preparing motion, but

(2) attorney fees incurred in connection with attempts to make service were not recoverable.

Motion granted.

**1. Federal Civil Procedure ⌾411**

Following defendant's refusal to execute request for waiver of service, plaintiff was entitled to recover costs of hiring private process server who effectuated formal service, costs in postage to process server, copying costs, and compensation for attorney time spent in preparation of motion to recover costs of service.  Fed.Rules Civ.Proc.Rule 4, 28 U.S.C.A.

**2. Federal Civil Procedure ⌾411**

Attorney fees incurred in connection with attempts to make service or to obtain a waiver of service were not recoverable under rule permitting recovery of attorney fees for motion to collect costs of service.  Fed.Rules Civ.Proc.Rule 4(d)(2)(5), 28 U.S.C.A.

———

Bryce J Denny, Cook Yancey et al, Shreveport, LA, for Dillard National Bank.

David A Szwak, Bodenheimer Jones Szwak, Shreveport, LA, for Plaintiff.

*MEMORANDUM RULING*

HORNSBY, United States Magistrate Judge.

Before the court is a **Motion for Award of Fees and Costs In Connection with Service of Process (Doc. 4)** filed by John Maranto ("Plaintiff") on the grounds defendant Dillard National Bank ("Defendant") refused to waive service.  The motion represents, through exhibits and an affidavit from counsel, that Defendant was afforded ample opportunity to execute a waiver of service.  A representative of Defendant told counsel for Plaintiff that Defendant would not execute a waiver.  Plaintiff's counsel made additional efforts to persuade Defendant, but Defendant nonetheless failed to execute a waiver.  Formal service was then made through a process server, and Defendant filed an answer.  Plaintiff then filed the motion for fees and costs that is before the court.  The Clerk of Court issued a notice that permitted Defendant 15 days to oppose the motion, but Defendant did not file any timely opposition.

Rule 4(d) states that an individual, corporation or association that receives notice of a suit and a request for waiver of service "has a duty to avoid unnecessary costs of serving the summons."  Accordingly, if a defendant within the United States fails to comply with a request for waiver, "the court shall impose the costs subsequently incurred in effecting service on the defendant unless good cause for the failure be shown."  F.R.C.P. 4(d)(2).  Those costs "shall include . . . the costs, including a reasonable attorney's fee, of any motion required to collect the costs of ser-